**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SAYED RAHMAN, MARK WEYERMULLER AND the ILLINOIS RENTAL PROPERTY OWNERS ASSOCIATION, | Civil Action No. 1:21-cv-04299 |
| Plaintiff, | |
| v. | |
| CENTERS FOR DISEASE CONTROL AND PREVENTION, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, ROCHELLE P. WALENSKY, in her official capacity as Director of the Centers for Disease Control and Prevention, UNITED STATES DEPARTMENT OF JUSTICE, and MERRICK GARLAND, in his official capacity as Attorney General of the United States, | **MEMORANDUM OF LAW SUPPORTING PLAINTIFFS' EXPEDITED MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

FACTS .......................................................................................................................................2

    I.      The Genesis of the CDC's Eviction Moratoriums. .......................................................2

    II.    The U.S. Supreme Court Already Determined the CDC Lacks Authority to Issue a Nationwide Eviction Moratorium. .......................................................................4

    III.   Faced With Mounting Political Pressure, the CDC Issues Another Eviction Moratorium. .................................................................................................................5

    IV.   The Economic Impact of the Eviction Moratorium. .....................................................6

REASONS FOR EXPEDITING THE MOTION .........................................................................9

LEGAL STANDARD ...............................................................................................................11

ARGUMENT ...........................................................................................................................11

    I.      Expedited Summary Judgment Should be Granted Because the Supreme Court—Along with the Sixth Circuit—Has Already Opined that the CDC is Without Authority to Impose a Nationwide Eviction Moratorium. ...................12

    II.    Expedited Summary Judgment is Appropriate under *Chevron* or *Skidmore* because the CDC's interpretation of its authority under the Public Health Service Act to regulate the entire U.S. rental-housing economy is unreasonable and unpersuasive. ...............................................................................13

    III.   The Current Eviction Moratorium's Supposed Tailoring Does Not Cure the CDC's Lack of Authority. ........................................................................................20

CONCLUSION .........................................................................................................................20

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abraham Lincoln Mem. Hosp. v. Sebelius*,
  698 F.3d 536 (7th Cir. 2012) ............................................................... 14

*Ala. Ass'n of Realtors v. United States HHS*,
  No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 152343 (D.D.C. Aug. 13,
  2021) ...................................................................................... 13, 20

*Ala. Ass'n of Realtors v. United States HHS*,
  No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568 (D.D.C. May 5, 2021) ............. passim

*Ala. Ass'n of Realtors v. United States HHS*,
  No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 92104 (D.D.C. May 14, 2021) .................. 12

*Ala. Ass'n of Realtors v. United States HHS*,
  No. 21-5093, 2021 U.S. App. LEXIS 16630 (D.C. Cir. June 2, 2021) ......................... 1, 4, 12

*Alabama Association of Realtors v. HHS*,
  141 S. Ct. 2320 (2021) ................................................................... passim

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) .......................................................................... 16

*Anderson Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................... 11

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995) .......................................................................... 16

*Bhd. Mut. Ins. Co. v. Ervin Cable Constr., LLC*,
  No. 05 C 3408, 2006 U.S. Dist. LEXIS 86967 (N.D. Ill. Nov. 27, 2006) ........................ 10

*Brown v. Azar*,
  497 F. Supp. 3d 1270 (N.D. Ga. 2020) ......................................................... 10

*Brown v. Sec'y, United States HHS*,
  No. 20-14210, 2021 U.S. App. LEXIS 20795 (11th Cir. July 14, 2021) ................... 1, 10, 13

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ....................................................................... 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................... 11

*Cen v. AG United States*,
  825 F.3d 177 (3d Cir. 2016) .................................................................. 15

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ................................................................... 12, 14, 15

*Chrysafis v. Marks*,
  594 U. S. ____ (2021), No. 21A8, 2021 U.S. LEXIS 3635 ............................... 11, 20

*Corley v. United States*,
   556 U.S. 303 (2009) ................................................................................................ 17

*CSX Transp., Inc. v. Alabama Dept. of Revenue*,
   562 U.S. 277 (2011) ................................................................................................ 17

*Cuozzo Speed Techs., LLC v. Lee*,
   136 S. Ct. 2131 (2016) ............................................................................................ 15

*EEOC v. Rockwell Int'l Corp.*,
   243 F.3d 1012 (7th Cir. 2001) ................................................................................. 9

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................................ 18

*Florida v. Becerra*,
   No. 21-cv-839, 2021 U.S. Dist. LEXIS 114297, 2021 WL 2514138 (M.D. Fla.
   June 18, 2021) .......................................................................................................... 1

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ................................................................................................ 19

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) .............................................................................................. 19

*Jones v. Thorne*,
   132 F. App'x 150 (9th Cir. 2005) ............................................................................ 9

*Penn Central Transp. Co. v. New York City*,
   438 U.S. 104 (1978) ................................................................................................ 20

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..................................................... 12, 14

*Terkel v. CDC*,
   No. 6:20-cv-00564, 2021 U.S. Dist. LEXIS 35570 (E.D. Tex. Feb. 25, 2021) ..... 19

*Tiger Lily LLC v. United States HUD*,
   499 F. Supp. 3d 538 (W.D. Tenn. 2020) ................................................................. 10

*Tiger Lily v. United States HUD*,
   No. 2:20-cv-02692-MSN-atc, 2021 U.S. Dist. LEXIS 59100 (W.D. Tenn.
   Mar. 15, 2021) .......................................................................................................... 1

*Tiger Lily, LLC v. United States HUD*,
   992 F.3d 518 (6th Cir. 2021) ......................................................................... 1, 16, 18

*Tiger Lily, LLC v. United States HUD*,
   No. 21-5256, 2021 U.S. App. LEXIS 21906, 2021 WL 3121373 (6th Cir. July
   23, 2021) ............................................................................................................. 1, 19

*Utility Air Regulatory Group v. EPA*,
   573 U.S. 302 (2014) ................................................................................................ 18

*White v. Scibana*,
   390 F.3d 997 (7th Cir. 2004) ................................................................................... 14

iv

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ............................................................................... 19

*Yates v. United States*,
   574 U.S. 528 (2015) ....................................................................... 16, 17

**Statutes**

42 U.S.C. § 264 ............................................................................. 1, 3, 15, 17, 18

**Other Authorities**

10B Federal Practice and Procedure, § 2768 (4th ed.) ................................. 9

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
   Texts* (2012) ................................................................................... 16

Trevor N. McFadden & Vetan Kapoor, *The Precedential Effect of the Supreme
   Court's Emergency Stays*, 44 Harv. J.L. & Pub. Pol'y 827 (2021) ...................... 13

**Rules**

Fed. R. Civ. P. 56 ............................................................................ 11

Fed. R. Civ. P. 57 ............................................................................. 9

Fed. R. Civ. Pro. 4 ........................................................................... 10

**Regulations**

42 C.F.R. 70.2 ................................................................................. 3

## INTRODUCTION

The Centers for Disease Control and Prevention has once again attempted to nationalize landlord-tenant law—this time defying a majority of the U.S. Supreme Court—with its recent Eviction Moratorium. This latest order, like those before it, oversteps the CDC's statutory authority in the Public Health Service Act, 42 U.S.C. 264(a), upon which the CDC relied. The Supreme Court noted this overstep in *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2320, 2320–21 (2021), in which Justice Kavanaugh opined that the CDC had "exceeded its existing statutory authority by issuing a nationwide eviction moratorium[.]" *Id.* (Kavanaugh, J., concurring). Therefore, to extend the eviction moratorium beyond July 31, 2021, he said, the CDC needs "clear and specific congressional authorization (via new legislation) . . ." *Id*. The Sixth Circuit has held the same. *Tiger Lily, LLC v. United States HUD*, 992 F.3d 518 (6th Cir. 2021) (stay); *Tiger Lily, LLC v. United States HUD*, No. 21-5256, 2021 U.S. App. LEXIS 21906, 2021 WL 3121373 (6th Cir. July 23, 2021) (merits). And the Eleventh Circuit has indicated tentative agreement. *Brown v. Sec'y, United States HHS*, No. 20-14210, 2021 U.S. App. LEXIS 20795, at *8 (11th Cir. July 14, 2021); *id.* at *60-65 (Branch, J., dissenting).[1] President Joe Biden and Speaker Nancy Pelosi failed in their last-ditch effort to pass such legislation, and the CDC cannot bail them out with an illegal executive action.

For these reasons, this court should declare unlawful and set aside the Eviction Moratorium on an expedited and nationwide basis and enjoin Defendants from enforcing the illegal order.

---

[1] *See Ala. Ass'n of Realtors v. United States HHS*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568, at *14-22 (D.D.C. May 5, 2021); *Tiger Lily v. United States HUD*, No. 2:20-cv-02692-MSN-atc, 2021 U.S. Dist. LEXIS 59100, at *24 (W.D. Tenn. Mar. 15, 2021). *See also Florida v. Becerra*, No. 21-cv-839, 2021 U.S. Dist. LEXIS 114297, 2021 WL 2514138, at *19 (M.D. Fla. June 18, 2021). *But see Ala. Ass'n of Realtors v. United States HHS*, No. 21-5093, 2021 U.S. App. LEXIS 16630, at *3 (D.C. Cir. June 2, 2021).

Plaintiffs seek expedited review of the Eviction Moratorium because it will cause millions of dollars in additional financial damage to the nation's rental property owners. The CDC issued this latest order with full knowledge that it lacked authority to do so, banking on a slow-moving judicial process. Furthermore, the CDC has already hinted that it may extend the Eviction Moratorium beyond October 3, 2021 (the order's end date is "subject to revision based on the changing public health landscape," Statement of Undisputed Facts, "SUF", ¶ 19), an action less likely if this Court grants this motion.

<strong>FACTS</strong>

## I.     The Genesis of the CDC's Eviction Moratoriums.

On January 27, 2020, the U.S. Department of Health and Human Services declared a public health emergency in response to COVID-19. The government policies, including shutdowns and lockdowns, implemented following its onset have taken a devastating toll on citizens' lives and livelihoods, with countless businesses shuttering and millions of workers out of work. To counter some of the economic effects of COVID-19, Congress passed the CARES Act in March 2020, a $2.2 trillion economic stimulus bill. (SUF ¶ 1). Among its measures, the CARES Act provided for a 120-day federal eviction moratorium that expired by operation of law on July 24, 2020, for properties covered by federal assistance programs or subject to federally-backed loans. (SUF ¶2).

On September 4, 2020, after the congressional authorization had expired, the CDC issued a "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19." (SUF ¶ 4). This action prohibited landlords nationwide from evicting certain tenants until December 31, 2020 ("Eviction Moratorium") regardless of whether a federal loan was involved. (SUF ¶ 4). The CDC's initial Eviction Moratorium provided that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered

2

person from any residential property in any jurisdiction to which this Order applies," through at least December 31, 2020. *Id.*

In issuing the Eviction Moratorium, the CDC relied upon Section 361 of the Public Health Service Act, 42 U.S.C. § 264, and a related regulation, 42 C.F.R. 70.2. (SUF ¶ 5). The Public Health Service Act provides, in relevant part:

> The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

The relevant regulations, at 42 C.F.R. § 70.2, provide as follows:

> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.

(SUF ¶ 6). Many of the programs instituted under the CARES Act to address the ongoing economic effects related to COVID-19 were continued by the Consolidated Appropriations Act of 2021 which, *inter alia*, extended the CDC's Eviction Moratorium until January 31, 2021. (SUF ¶7). Rather than allow the moratorium to expire, on January 29, 2021, shortly after President Biden

took office, the CDC extended and modified its initial Eviction Moratorium order until March 31, 2021. (SUF ¶9).

The CDC again modified and extended the Eviction Moratorium until June 30, 2021 (SUF ¶10), and then again extended the moratorium for another month—until July 31, 2021—saying that this one-month extension was intended to be a final extension. (SUF ¶ 11). As this history shows, this order has proven to be capable of repetition and anything but temporary.

## II. The U.S. Supreme Court Already Determined the CDC Lacks Authority to Issue a Nationwide Eviction Moratorium.

Plaintiffs' lawsuit is hardly the first legal challenge to the CDC's Eviction Moratorium. A similar suit was brought before the U.S. District Court for the District of Columbia related to the CDC's initial Eviction Moratorium (and subsequent extensions), in which the D.C. District Court granted expedited summary judgment to the plaintiffs finding the CDC lacked authority to issue the order in the first place. *Ala. Ass'n of Realtors v. United States HHS*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568 (D.D.C. May 5, 2021). The district court then stayed its own ruling pending appeal, a stay which the D.C. Circuit upheld. *Ala. Ass'n of Realtors v. United States HHS*, No. 21-5093, 2021 U.S. App. LEXIS 16630 (D.C. Cir. June 2, 2021). On June 29, 2021, a majority of the justices of the Supreme Court indicated their agreement with the District Court's decision to strike down the CDC's Moratorium. 141 S. Ct. at 2320–21. Four justices voted to grant an emergency application to vacate the stay. Justice Kavanaugh issued a concurrence concluding the moratorium exceeded the limits Congress placed on the CDC's authority but kept the moratorium in place based on his balancing of equities given the order was set to expire shortly. *Id*. (See also SUF ¶¶ 11-13).

### III.     Faced With Mounting Political Pressure, the CDC Issues Another Eviction Moratorium.

President Biden and Speaker Pelosi then attempted, but failed, to gather sufficient House votes to modify the CDC's statutory authority to extend the moratorium. (SUF ¶ 14). President Biden, the President's Press Secretary, the President's COVID-19 czar, and the CDC publicly acknowledged that the CDC lacked the legal authority to put a new eviction moratorium in place. (SUF ¶ 15). Nevertheless, on August 3, 2021, the CDC once again issued a nationwide order halting residential evictions. (SUF ¶ 16).

The CDC's August 3, 2021, Eviction Moratorium states that a property owner shall not evict a "covered person" "while COVID–19 transmission is substantial or high and the relevant state, county, locality, or territory has provided a level of public-health protections below the requirements listed in this Order." *Id.* at 43251. (SUF ¶ 17). The Eviction Moratorium defines a "covered person" as "any tenant, lessee, or resident of a residential property" who presents to the property owner "a declaration under penalty of perjury indicating that:

(1)     The individual has used best efforts to obtain all available governmental assistance for rent or housing;

(2)     The individual either (i) earned no more than $99,000 (or $198,000 if filing jointly) in Calendar Year 2020 or expects to earn no more than $99,000 in annual income for Calendar Year 2021 (or no more than $198,000 if filing a joint tax return), (ii) was not required to report any income in 2020 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check).

(3)     The individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;

(4)     The individual is using best efforts to make timely partial rent payments that are as close to the full rent payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;

(5)     Eviction would likely render the individual homeless—or force the individual to move into and reside in close quarters in a new congregate or shared living setting—because the individual has no other available housing options; and

(6)     The individual resides in a U.S. county experiencing substantial or high rates of community transmission levels of SARS–CoV–2 as defined by CDC."

*Id.* at 43245 (footnotes omitted). (SUF ¶ 18).

The Eviction Moratorium imposes stiff criminal penalties on property owners who violate the order, including fines of up to $100,000 ($250,000 if a death results) and up to one year in jail. *Id.* at 43252. (SUF ¶ 20). The CDC less-than-gently reminds landlords of this fact on the check-box declaration form it provides tenants on its website. (SUF ¶ 20). Although the new Eviction Moratorium is limited to areas with "substantial" or "high" rates of community transmission of COVID, 90 percent of the U.S. falls within the Order and the CDC currently classifies 70 Illinois counties as counties of "high" transmission and 27 more as "substantial," meaning 97 of the 102 counties in Illinois are covered by the order, including all of the major population centers like Cook, DuPage, Lake, Will, and Kane counties. (SUF ¶¶ 21-23). These are the counties where the two individual plaintiffs currently operate their rental businesses; IRPOA's constituent associations have members statewide.

## IV.    The Economic Impact of the Eviction Moratorium.

The latest Eviction Moratorium, like those before it, is economically significant. (SUF ¶¶ 35-38, 51-52, 60-64). The CDC estimated that its initial Eviction Moratorium would affect "as many as 30–40 million people in America [who] could be at risk of eviction" absent the Eviction Moratorium. (SUF ¶ 7). A recent Policy Link/USC Equity Research Institute study shows the current rental debt as exceeding $21,000,000,000. (SUF ¶ 64).

6

The effects of the Eviction Moratorium have already borne out on the Plaintiffs in this case. Plaintiffs are comprised of individual rental property owners and managers as well as an association of rental property owners. Plaintiff Syed Rahman, owner and manager of rental townhomes located in Will and DuPage counties, immigrated to the United States in 2010 (naturalized in 2013) to pursue the American Dream. (SUF ¶¶ 27-29). Rahman bet his retirement on rental housing following his 35-year career in information technology. (SUF ¶ 30). Using his pension funds as collateral, Rahman invested in ten rental properties and has developed a business network that helps his business run smoothly, including a real estate lawyer, a real estate agency, and a handyman. (SUF ¶¶ 30-31). Most or all of his tenants earn less than $99,000 per year and could file declarations under the Eviction Moratorium. (SUF ¶ 34).

Rahman relies on the rent he gathers to pay the property taxes, HOA fees, and maintenance costs of these properties. (SUF ¶¶ 33; 42). Two of Rahman's tenants have requested rental relief due to financial hardship while the eviction moratoriums have been in place and at least one tenant owes Rahman back-rent. (SUF ¶ 33). The Eviction Moratorium has contributed to Rahman's decision to accept requests for rent relief and Rahman is consequently looking to exit the rental business. (SUF ¶ 39). Importantly, Rahman also relies on this rental income to fund his retirement. (SUF ¶ 42).

Plaintiff Weyermuller is a shareholder in a limited liability corporation that owns five rental properties located in Cook County. (SUF ¶ 43). Weyermuller's properties provide rental housing for about 200 tenants, most earning less than $99,000 a year. (SUF ¶¶ 44, 48). Weyermuller relies on the rent monies he and his partner collect to pay down the mortgages on their properties. (SUF ¶¶ 44, 48). The Eviction Moratorium has contributed to Weyermuller's decision to accept requests

7

for rent reductions that he otherwise would not have accepted and his reduced rental income. (SUF ¶¶ 50-52).

Plaintiff Illinois Rental Property Owners Association ("IRPOA") is an umbrella organization of thirteen independent real estate investor associations located throughout Illinois. (SUF ¶¶ 54-55). IRPOA exists to "promote the interests of persons, firms, and corporations who develop, own, or manage residential rental housing; to inform members about current issues and interests, including legislative activities; and to conduct such activities as are necessary to carry out the goals of the Association." (SUF ¶ 55). The thirteen independent associations in IRPOA's membership include approximately 1,000 rental property owners. (SUF ¶ 56). Combined, these individual members own approximately 10,000 units, the majority of which are rental units, throughout Illinois. (SUF ¶ 57). Many IRPOA owner-members have already received from their tenants sworn statements claiming they qualify for the state eviction eviction moratorium. (SUF ¶ 9). The members of IRPOA's associations range from large corporate management companies to small, "mom and pop" owners of duplex homes. (SUF ¶ 6).

Though all owners are hurt by the moratorium, the punch hits smaller owners like Rahman, Weyermuller, and IRPOA's individual members especially hard. (SUF. ¶¶ 35-38, 51-52, 60-64). In the words of one Brookings Institution report, "without rental income, a significant number of noncorporate, 'mom and pop' landlords—who may be coping with their own unemployment or additional expenses related to the COVID-19 pandemic—will also struggle to pay their mortgages, utilities bills, property taxes, maintenance costs, and other property-related expenses." (SUF ¶ 62). The Brookings report continues, "The loss of rental income under the eviction moratorium represents a significant income shock for smaller landlords of modest means. Our analysis finds that 40 percent of residential property units are owned by individual investor landlords. Among

those owning residential investment property, roughly a third are from low- to moderate-income households; property income constitutes up to 20 percent of their total household income." (SUF ¶ 63).

A recent CNBC report illustrates the economic impact of the Moratorium on Plaintiffs: "The majority of the nation's landlords are individual investors. They own about 23 million units in 17 million properties, according to the U.S. Census. More than 6 million renter households are behind on rent, also according to the Census. Landlords have next to no recourse." (SUF ¶ 65). Though Illinois currently has in place an eviction moratorium from the Governor, it is set to expire on August 31, 2021, and the Governor has publicly stated he will not renew it. (SUF ¶ 25).

The Eviction Moratorium prevents Plaintiffs from evicting tenants who have not paid rent and lease their properties to tenants who will pay, regardless of Plaintiffs' reliance on rental income. *See* SUF ¶¶ 35, 39, 49, 51, 61. Plaintiffs such as Rahman rely on these rental payments to sustain their retirement and even pay for the properties and their maintenance. (SUF ¶¶ 33, 47). The CDC's overreach invariably harms the Plaintiffs. *Id.*

## REASONS FOR EXPEDITING THE MOTION

This Court's prompt action is necessary because the Plaintiffs would have their property rights restored on August 31, 2021, with the expiration of the Governor's order, but for the CDC's new order putting a moratorium in place until early October. *See Ala. Ass'n of Realtors*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568, at *2 (D.D.C. May 5, 2021) (deciding a similar challenge to a prior eviction moratorium on an expedited motion for summary judgment).

"Federal district courts have the inherent power to administer their dockets so as to conserve scarce judicial resources." *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1016 (7th Cir. 2001). *Accord* Fed. R. Civ. P. 57 ("The court may order a speedy hearing of a declaratory-judgment

action.").[2] On a motion to expedite, the court should consider whether the defendant has received notice and an opportunity to be heard and whether an expedited schedule prejudices the defendant. *Jones v. Thorne*, 132 F. App'x 150 (9th Cir. 2005).

Here, Plaintiffs have served the United States Attorney and the relevant federal agencies pursuant to Fed. R. Civ. Pro. 4(i). Plaintiffs made the Defendants' counsel in the *Alabama Realtors* case aware of this case the day the complaint was filed. The United States has already responded to similar arguments on an expedited basis in the *Alabama Realtors* case, 1:20-cv-03377-DLF. There, the plaintiffs filed an emergency motion before the D.C. District Court on August 4 (ECF 67), the Department of Justice filed a response on August 6 (ECF 69), and the court held a hearing on August 9 (ECF 8/9/21 minute entry). Compared to a two-day turnaround, the government will not be prejudiced by briefing over the coming two-plus weeks before the state moratorium expires. Moreover, this case presents straightforward issues of law that require no factual determinations but rather present legal questions "particularly well-suited for summary judgment." *Bhd. Mut. Ins. Co. v. Ervin Cable Constr., LLC*, No. 05 C 3408, 2006 U.S. Dist. LEXIS 86967, at *5-6 (N.D. Ill. Nov. 27, 2006). The U.S. Supreme Court has already strongly indicated that those legal questions should be resolved in favor of rental property owners, such as Plaintiffs. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2320–21.

Plaintiffs, by contrast, will be significantly prejudiced if they do not receive a speedy hearing because the Eviction Moratorium will continue to harm their businesses with each passing day. This case is not suited for a preliminary injunction because Plaintiffs' damages are monetary

---

[2] *See generally* 10B Federal Practice and Procedure, § 2768 (4th ed.) ("The provision of Rule 57 that the court 'may order a speedy hearing of a declaratory-judgment action,' is so sensible and appropriate that there is a dearth of decided cases involving that provision. Nevertheless it has been applied to effectuate the purpose of the rule and expedite a decision.").

in nature, and thus theoretically reparable.[3] But those monetary claims are against the tenants, not the United States (and whether landlords can collect judgments against all their debtor tenants is itself a dubious proposition). Thus, unless this court grants a speedy hearing, Plaintiffs will continue to suffer financial harm needlessly given the Supreme Court's position in *Alabama Association of Realtors*.[4] Moreover, the rule of law will suffer every day that courts permit the President to knowingly engage in lawlessness in order to achieve a policy objective by playing for time as litigation drags on without reaching the obvious resolution.[5]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists it the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Once a moving party has set forth a properly supported motion for summary judgment, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250.

---

[3] *See Brown v. Sec'y, United States HHS*, No. 20-14210, 2021 U.S. App. LEXIS 20795, at *18 (11th Cir. July 14, 2021); *Tiger Lily LLC v. United States HUD*, 499 F. Supp. 3d 538, 551 (W.D. Tenn. 2020)*; Brown v. Azar*, 497 F. Supp. 3d 1270, 1297 (N.D. Ga. 2020) (denying preliminary injunction requests as to prior iterations of the moratorium because the harm is monetary in nature).

[4] To the extent the court also considers the equities of expediting as affecting non-parties, Plaintiffs note that the U.S. Supreme Court on Thursday granted an injunction pending appeal against an eviction moratorium law in New York State set to expire in less than three weeks. *Chrysafis v. Marks*, 594 U. S. _____ (2021), No. 21A8, 2021 U.S. LEXIS 3635.

[5] In the President's words, "By the time this gets litigated, it will probably give some additional time while we're getting that $45 billion out to people . . ." SUF ¶16. Or, as U.S. Rep. Cori Bush put it, "'We are asking the White House to go ahead and set a new moratorium and let us get that action rolling while Congress reconvenes . . . . If there is a challenge to the White House, you know, that will take a little bit of time." SUF ¶16.

**ARGUMENT**

Summary judgment is appropriate in this case because the CDC lacks authority to impose a nationwide Eviction Moratorium and the CDC knows it. The White House admitted the Supreme Court's decision in *Alabama Realtors*, *supra*, 141 S. Ct. at 2320–21, "made the option [of an Eviction Moratorium] no longer available." (SUF ¶ 16). Justice Kavanaugh could not have been any clearer when he opined that the CDC had "exceeded its existing statutory authority by issuing a nationwide eviction moratorium[.]" *Id.*

Even absent *Alabama Realtors*, the Eviction Moratorium exceeds the CDC's statutory authority under Section 361 whether analyzed under *Chevron* or *Skidmore*. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). No method of statutory interpretation supports the CDC's regulation of the entire U.S. rental economy. Rather, Congress carefully circumscribed the CDC's powers in Section 361 and made clear that statutory authority was necessary when it adopted the original CARES Act moratorium for a limited number of properties for a limited number of days. For these reasons, this court should grant Plaintiffs' expedited motion for summary judgment.

**I.     Expedited Summary Judgment Should be Granted Because the Supreme Court—Along with the Sixth Circuit—Has Already Opined that the CDC is Without Authority to Impose a Nationwide Eviction Moratorium.**

As a threshold matter and as stated above, the CDC's latest Eviction Moratorium defies *Alabama Realtors*, 141 S. Ct. at 2320. The district court granted summary judgment to the realtors but stayed its own order pending appeal. *Ala. Ass'n of Realtors v. United States HHS*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568, at *1 (D.D.C. May 5, 2021) (granting summary judgment); *Ala. Ass'n of Realtors v. United States HHS*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 92104, at *1 (D.D.C. May 14, 2021) (granting stay pending appeal). The D.C. Circuit upheld the stay against a challenge from the realtors, who sought immediate relief. *Ala. Ass'n of*

*Realtors v. United States HHS*, No. 21-5093, 2021 U.S. App. LEXIS 16630, (D.C. Cir. June 2, 2021). Four justices of the Supreme Court indicated they would grant an emergency application vacating the stay, indicating their agreement with the district court's ruling in favor of the realtors on the merits. A fifth justice, Justice Kavanaugh, stated that he "agree[d] with the District Court and the applicants that the Centers for Disease Control and Prevention exceeded its existing statutory authority by issuing a nationwide eviction moratorium," but felt the equities were best balanced by permitting the moratorium to expire on its own. 141 S.Ct. at 2320. Thus, "five justices appear to agree that the CDC Order likely exceeds the statutory authority set out in § 264(a)." *Brown*, No. 20-14210, 2021 U.S. App. LEXIS 20795, at *71 (Branch, J., dissenting). *See Ala. Ass'n of Realtors v. United States HHS,* No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 152343, at *15 (D.D.C. Aug. 13, 2021) ("the Supreme Court's recent decision in this case strongly suggests that the CDC is unlikely to succeed on the merits.").[6]

In a press release issued July 29, 2021, the White House lamented the CDC's inability to issue another Eviction Moratorium following *Alabama Realtors*:

> . . . President Biden would have strongly supported a decision by the CDC to further extend this eviction moratorium to protect renters at this moment of heightened vulnerability. Unfortunately, the Supreme Court has made clear that this option is no longer available. In June, when CDC extended the eviction moratorium until July 31st, the Supreme Court's ruling stated that "clear and specific congressional authorization (via new legislation) would be necessary for the CDC to extend the moratorium past July 31.

(SUF ¶ 16). In light of this public admission of the CDC's lack of authority, it is clear the latest Eviction Moratorium was nothing short of manipulation of the legal system. For this reason alone,

---

[6] *See* Hon. Trevor N. McFadden & Vetan Kapoor, *The Precedential Effect of the Supreme Court's Emergency Stays*, 44 Harv. J.L. & Pub. Pol'y 827 (2021).

expedited summary judgment is not only appropriate but necessary to cease the CDC's unabashed overreach.

II. **Expedited Summary Judgment is Appropriate under *Chevron* or *Skidmore* because the CDC's interpretation of its authority under the Public Health Service Act to regulate the entire U.S. rental-housing economy is unreasonable and unpersuasive.**

Even in the absence of *Alabama Realtors*, the CDC's interpretation of its authority to impose a national Eviction Moratorium fails under any applicable standard of deference afforded by this court. The Eviction Moratorium is a complete overstep of the CDC's power under any canon of statutory interpretation.

As an administrative agency order, this case would usually be scrutinized under the familiar *Chevron* two-step framework. *Chevron*, 467 U.S. at 842. But "[f]ull *Chevron* deference is limited to cases in which it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority, as when the agency engages in adjudication or notice-and-comment rulemaking." *White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004) (*discussing United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001)). "[A]gency interpretations contained in formats such as opinion letters, policy statements, agency manuals, and enforcement guidelines (as opposed to an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking)" are entitled to the lesser *Skidmore* deference. *Abraham Lincoln Mem. Hosp. v. Sebelius*, 698 F.3d 536, 545-55 (7th Cir. 2012).

This case dances right on the line drawn in *Mead* and its progeny. On the one hand, the CDC Eviction Moratorium is a formal order with the force of law, not an informal policy letter or agency manual. On the other hand, it has not been promulgated through notice-and-comment rulemaking, nor does it represent a formal adjudication in a contested case. In any event, the right type of

14

scrutiny or deference does not really matter, because no level of deference can justify this moratorium given the statutory text.

Even assuming for the sake of argument that the more deferential *Chevron* test applies, the CDC's unfettered interpretation of Section 361(c) cannot survive. *Chevron*, 467 U.S. at 842. At step one, the court must first consider "whether Congress has directly spoken to the precise question at issue," in which case the inquiry would stop if the intent of Congress is clear. *Chevron*, 467 U.S. at 837, 842. To determine the statutory language's meaning, courts look to "the statutory text, as well as traditional tools of statutory construction, including canons of construction and the broader statutory context." *Cen v. AG United States*, 825 F.3d 177, 186 (3d Cir. 2016).

The CDC cannot survive beyond Step 1 for three reasons. *First*, Congress answered this question when it passed the CARES Act and Consolidated Appropriations Act of 2021 setting moratoria with specific expirations dates. If the CDC had this power on its own all along, then no congressional action would have been necessary. For Congress to set a specific expiration date and the CDC to decide on a different expiration date is a bald preemption of Congressional prerogative.

*Second*, the statute is not ambiguous, and "[w]here a statute is clear, the agency must follow the statute." *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016). Here, the statutory text, read with traditional canons of construction and the broader statutory context, shows the CDC lacks this authority.

Section 361 authorizes the CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). "For purposes of carrying out and enforcing such regulations," the CDC "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection

to human beings, and other measures, as in [its] judgment may be necessary." *Id.* Subsections (b)–(d) authorize the CDC to quarantine individuals to prevent the spread of a communicable disease under certain conditions. *Id.* § 264(b)–(d).

The CDC has tried to justify its regulation as falling under the "other measures" it judges necessary. *Tiger Lily, LLC*, 992 F.3d at 522. Under any cannon of statutory interpretation, the catch-all phrase "other measures" cannot be reasonably read to allow the CDC to promulgate rules suspending the entire U.S. rental housing market.

It is a basic principle of law and common sense that this catch-all phrase must be read in line with the rest of the list delegating the CDC's authority. The legal term for this principle recognized by the Supreme Court is "ejusdem generis," which means "[w]here general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (citing *Norfolk & W. R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991)).[7] *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). This canon of statutory interpretation shows the Court's deference for the intent of Congress: "Had Congress intended the latter 'all encompassing' meaning, it is hard to see why it would have needed to include the examples at all." *Yates v. United States*, 574 U.S. 528, 545-46 (2015) (cleaned up; *quoting Begay v. United States*, 553 U.S. 137, 142 (2008)). Here, Section 361(a)'s enumeration of specific measures—"inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles"—indicates that "other measures" refers to other

---

[7] Others might call it the canon *noscitur a sociis,* "but the principle is much the same: The fact that 'several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 720-21 (1995) (Scalia, J., dissenting) (quoting *Beecham* v. *United States,* 511 U.S. 368, 371 (1994)). Under either canon, "a word is known by the company it keeps." *Ali*, 552 U.S. at 226.

*similar* measures, not literally *any* other measure. The phrase "other measures" cannot "be interpreted so generically as to capture" measures that are "as dissimilar as" an eviction moratorium and "pest extermination." *Yates*, 584 U.S. at 545–46. "Had Congress intended the latter 'all encompassing' meaning . . . 'it is hard to see why it would have needed to include the examples at all.'" *Id.* (quotation omitted).

In addition, a statute must be construed to give effect to all its provisions, "so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotations omitted). Thus, use of a general word cannot render specific words meaningless. *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011). Reading the first sentence of 361(a) in conjunction with the second sentence, the phrase "other measures" cannot reasonably be read as authorizing a nationwide eviction moratorium without rendering the first sentence superfluous. For example, Section 361(a)'s first sentence is a delegation clause providing that the CDC "is authorized to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . ." 42 U.S.C. § 264(a). The second sentence elaborates on that delegation: "For purposes of carrying out and enforcing *such regulations*, [the CDC] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [its] judgment may be necessary." *Id.* (emphasis added). The second sentence would be superfluous if the CDC could adopt <u>any regulation</u> "necessary to prevent the introduction, transmission, or spread of communicable diseases" without regard to the specific actions authorized in the second sentence. By the same token, the list of measures within the second sentence would be superfluous if the CDC could push any action through as "other measures."

17

*Third*, the additional context of Subsections (b)-(d), governing quarantine show that Congress has granted CDC only one type of power over the interstate movement of individuals who might spread a communicable disease—quarantine—and that subject to specified safeguards. A quarantine and an eviction moratorium may both keep people in their homes, but that does not make the latter a form or subset of the former.

The District Court in *Alabama Realtors* rejected the idea that "quarantine" could cover the moratorium. *Ala. Ass'n of Realtors*, 2021 U.S. Dist. LEXIS 85568, at *23. Rather, "Congress intended to give the Secretary—and, by extension, health experts in the CDC—the discretion and flexibility to thwart the spread of disease. But the quarantine provisions in § 264(b)-(d) are structurally separate from those in § 264(a)." *Id.*, *citing Tiger Lily*, 992 F.3d at 524 (noting that the provisions in § 264(b)-(d) restrict individual liberty interests, while § 264(a) is concerned exclusively with property interests). Thus, this Court should find like the D.C. District Court and Sixth Circuit before it, that summary judgment is appropriate because the quarantine provisions in Section 264(b)-(d) do not provide support for the Eviction Moratorium.

Other principles of interpretation support this reading. According to the CDC's interpretation of Section 361, the CDC would have unbridled power to promulgate any regulation that would have the arguable effect of preventing the spread of a communicable disease. The Supreme Court has explained that courts should not lightly presume congressional intent to implicitly delegate decisions of major economic or political significance to agencies. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) (plurality) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."). Under the CDC's interpretation of Section 361,

there would be no limit to the measures that the CDC could unilaterally impose—a ban on foreclosures, a nationwide lockdown, church and business shutdowns, or a restriction on gatherings. There is a reason all of these other actions were taken on a state-by-state basis by governors rather than the CDC: the CDC lacked the power to do them.

Speaking of states, the principles of statutory interpretation also dictate that courts should presume Congress does not intend to invade traditional state prerogatives without saying so clearly. "The background principles of our federal system belie the notion that Congress would use an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006) (cleaned up). Put differently, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). Congress did not make unmistakably clear in the Public Health Services Act that it was displacing the traditional state power over real property and landlord-tenant law. *Tiger Lily, LLC*, No. 21-5256, 2021 U.S. App. LEXIS 21906, at *9.

Even further, the canon of constitutional avoidance counsels against adopting a radically expansive vision of the CDC's powers. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). The CDC's preferred interpretation raises substantial constitutional issues around federalism, enumerated powers, and the Tenth Amendment; the due process rights to access to courts; and the Fifth Amendment right against takings. As discussed above, the CDC's interpretation would displace a traditional state power. *Terkel v. CDC*, No. 6:20-cv-00564, 2021 U.S. Dist. LEXIS 35570, at *31 (E.D. Tex. Feb. 25,

2021) (finding the CDC order exceeds the government's powers under the Commerce Clause). And as the U.S. Supreme Court found just this week, there are substantial due-process issues with denying landlords their day in court. *Chrysafis v. Marks*, 594 U. S. ____ (2021), No. 21A8, 2021 U.S. LEXIS 3635 at *1-2. And if tenants do not eventually pay their rent, then the order likely constitutes a regulatory taking of private property under the Fifth Amendment. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). The court can avoid these constitutional thickets by simply applying a common-sense reading to the statute.

### III. The Current Eviction Moratorium's Supposed Tailoring Does Not Cure the CDC's Lack of Authority.

This latest Eviction Moratorium is supposedly different from the prior version because it only covers counties with "high" or "substantial" community transmission of COVID-19. (SUF ¶ 18). At present, this standard covers 90 percent of the country. (SUF ¶ 22). This charade should not stand. The CDC lacks the power to regulate the U.S. economy. It lacks the power to regulate landlord-tenant financial relations. It lacks that power when it exercises it over some counties or all counties. It lacks that power when it exercises it over some tenants or all tenants. No amount of tailoring makes national regulation of landlord-tenant monetary transactions akin to fumigation or pest extermination. The CDC's attempt to tailor fails to fix the underlying problem: regulation of this kind isn't within the scope of the statute. And even the government has acknowledged as much. *Ala. Ass'n of Realtors*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 152343, at *9.

### CONCLUSION

Given the financial harm the CDC's Eviction Moratorium is inflicting, it is imperative that this court grant Expedited Summary Judgment to stop the CDC's overreach. This court should not allow the CDC to abuse the litigation process to achieve its unlawful means while Plaintiffs are

deprived of their legal right to collect rent and evict tenants who fail to comply with their legal obligations. The CDC knew this challenge would come and is well aware it lacked authority to issue the Eviction Moratorium. This court must now confirm those obvious legal conclusions.

For all these reasons, Plaintiffs request that this court grant their motion.

Dated: August 19, 2021                                  Respectfully Submitted,


                                                        By: /s/ Daniel R. Suhr
                                                        Daniel R. Suhr (WI No. 1056658)
                                                        Liberty Justice Center
                                                        141 W. Jackson Street, Suite 1065
                                                        Chicago, Illinois 60604
                                                        Telephone (312) 637-2280
                                                        dsuhr@libertyjusticecenter.org

                                                        *Attorneys for Plaintiff*